UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MONTANA SMITH,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        No.  4:13CV1933 ACL
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

## MEMORANDUM AND ORDER

Plaintiff Montana Smith brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3) for judicial review of the Commissioner's final decision denying

her applications for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and for supplemental security income

(SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are

pending before the undersigned United States Magistrate Judge, with consent of

the parties, pursuant to 28 U.S.C. § 636(c).  For the reasons that follow, the

decision of the Commissioner is affirmed.

### I.  Procedural History

Plaintiff applied for DIB and SSI on February 15, 2011, claiming that she

became disabled on January 1, 2008, because of bipolar disorder, depression, and

anxiety.  (Tr. 130-33, 134-39, 173.)  On initial review and on reconsideration, the Social Security Administration denied plaintiff's claims for benefits.  (Tr. 66-69, 70-75, 86-89.)  At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on June 11, 2012, at which plaintiff and a vocational expert testified.  (Tr. 32-65.)  The ALJ issued a decision on July 20, 2012, denying plaintiff's claims for benefits, specifically finding that plaintiff's substance abuse was a contributing factor material to a finding of disability, and that plaintiff would be able to perform work as it exists in significant numbers in the national economy absent such abuse.  (Tr. 10-27.)  On August 5, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-5.)  The ALJ's decision is thus the final decision of the Commissioner.  42 U.S.C. § 405(g).

In this action for judicial review, plaintiff claims that the ALJ erred by failing to explain how the evidence supported his conclusion that substance abuse was a contributing factor material to a finding of disability.  Plaintiff further claims that the ALJ improperly disregarded evidence relating to her low Global Assessment of Functioning (GAF) scores.  Plaintiff requests the Court to remand the matter to the Commissioner for further consideration.

## II.  Testimonial Evidence Before the ALJ

A.      Plaintiff's Testimony

At the hearing on June 11, 2012, plaintiff testified in response to questions

posed by the ALJ and counsel.

Plaintiff was twenty-eight years of age at the time of the hearing. She attended school through the eighth grade and subsequently earned her GED. Plaintiff is single and has five children ranging in age from seven to thirteen years. (Tr. 35-36.) Plaintiff was in the process of moving from Arkansas to St. Louis. (Tr. 56-57.) The four younger children were currently staying with their grandmother or godmother in Arkansas, but were going to move to St. Louis at the beginning of the school year to live with plaintiff and her mother. Plaintiff's thirteen-year-old son lived with plaintiff. (Tr. 37-38, 59-60.)

Plaintiff's Work History Report shows that plaintiff worked as a cashier and food preparer at fast food restaurants in 2000 and 2001. In 2001 and 2002, plaintiff worked as a certified nurses' assistant (CNA); and from 2001 to 2003, she worked as a restaurant server. Plaintiff worked as a telemarketer in 2003 and 2004. In 2008, she worked as a hotel housekeeper. (Tr. 187.) Plaintiff testified that she also worked for a temporary agency through which she had other jobs for two or three weeks. Plaintiff testified that she last worked for two weeks in April 2012, but could not do the job because of her nerves. Plaintiff previously lost a job because of panic attacks. (Tr. 44-46, 54.) Plaintiff testified that the reasons she can no longer work, include that: her moods are "off balance"; she cannot be around groups of people, including her family; and her medication sedates her.

(Tr. 37.)

Plaintiff testified that she suffers from mood disorders, including anxiety, manic depression, and anger issues, and that she has received treatment for such disorders since she was thirteen years old. (Tr. 38.) Plaintiff testified that treatment helped her depression, but that her anxiety has worsened. (Tr. 49-50.) Plaintiff testified that she had been buying Xanax off the street for about two years, because her prescribed medication did not help her anxiety. Plaintiff recently stopped using Xanax when she went to jail for failure to pay old fines. Plaintiff testified that she was in jail for about fifty days and had just been released a couple of days ago. Plaintiff was off of all of her medications while she was in jail. (Tr. 39, 41-42, 47-48.) Plaintiff testified that she was scheduled to begin a twelve-week therapy program in August and had to participate in the program in order to get back on her medication. Plaintiff testified that without her medication, she was beginning to have suicidal thoughts. (Tr. 48-49, 55.)

Plaintiff also testified to a history of marijuana use. Plaintiff testified that she last used the substance about one and a half years prior and had smoked marijuana about once every two weeks at a friend's house. (Tr. 38-40.) Plaintiff testified that she used marijuana for only about four months. (Tr. 47.) Plaintiff testified that she also previously drank alcohol at bars or clubs. (Tr. 39, 41.)

Plaintiff testified that she was currently on probation after having pled guilty

to fraudulent use of a credit card, and that she had to participate in anger management classes as a condition of probation.  (Tr. 42-43, 49.)

Plaintiff testified that before moving her things to St. Louis in May 2012, she lived by herself and spent her time in bed, depressed.  Plaintiff testified that she only left her house when she started getting little jobs and that, when not working, she would stay in bed, watch television, and write.  Plaintiff testified that her cousin would visit her.  (Tr. 57-58.)  Plaintiff testified that she stopped going to clubs and associating with friends.  (Tr. 60.)

B.     Vocational Expert Testimony

David Elmore, a vocational rehabilitation specialist, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Elmore classified plaintiff's past work as a fast food worker as light to medium and unskilled; as a CNA as medium to heavy and semi-skilled; as a telemarketer as sedentary and semi-skilled; and as an order filler as light and semi-skilled.  (Tr. 61-62.)

The ALJ asked Mr. Elmore to assume a person plaintiff's age with plaintiff's level of education and work experience, and to further assume the person to have only non-exertional limitations as follows:

> [She] can perform unskilled, standardized work involving few if any changes.
>
> This work is simple, routine, and repetitive in nature, with one- or

two-step instructions.  This work is done alone and not in collaboration with others or in a team.  This person requires supervision, which is simple, direct, and concrete.

And this person would have no contact with the general public, but would be able to maintain occasional contact with co-workers and supervisors.  Finally, . . . this individual would be limited from work involving production quotas, such as assembly line or piece work.

(Tr. 62.)  Mr. Elmore testified that such a person could not perform any of plaintiff's past work but could perform work as a cleaner in a hospital or nursing home facility, of which 3,700 such jobs exist in the State of Arkansas and 420,000 nationally; and as a cleaner in housekeeping, of which 600 such jobs exist in the State of Arkansas and 400,000 nationally.  (Tr. 62-63.)

The ALJ then asked Mr. Elmore to assume the same individual, but that she would also experience up to three unscheduled absences each month as the result of psychologically-based symptoms.  Mr. Elmore testified that no work would be possible for such an individual.  (Tr. 63.)

### III.  Medical Evidence Before the ALJ

On January 25, 2006, plaintiff underwent a psychiatric evaluation at Mid-South Health Systems (MSHS).  She reported having depression since her adolescence and that she had been hospitalized twice for depression and suicidal ideas.  Plaintiff was not currently suicidal.  Plaintiff reported having participated in outpatient treatment and medication therapy, which she stopped because of weight gain.  Plaintiff was currently not taking any medication.  Plaintiff reported her

primary problems to be stress, fatigue, and sleep loss. Mental status examination showed plaintiff to be in no distress at all and to be very pleasant and businesslike. Plaintiff's mood was noted to be depressed and stressed. Dr. David D. Erby noted plaintiff's cognitive functioning to be intact and considered plaintiff to be of normal intelligence. Dr. Erby diagnosed plaintiff with major depression, recurrent, and assigned a GAF score of 56.[1] Plaintiff was prescribed Lexapro and was instructed to return in one month. (Tr. 337-38.)

On April 16, 2007, plaintiff visited MSHS and requested medication management. Plaintiff reported that she stays awake for days and usually wants to hurt someone. Plaintiff reported abusing Ecstasy, Xanax, and marijuana. Mental status examination showed plaintiff to be fully oriented and to have a logical and organized thought process. Plaintiff denied suicidal or homicidal ideations. Shunita Young, a Licensed Master Social Worker, diagnosed plaintiff with polysubstance abuse and assigned a GAF score of 58. Substance abuse treatment was recommended, but plaintiff declined. (Tr. 313.)

Plaintiff was admitted to St. Bernard's Medical Center on January 4, 2008, after a suicide attempt that resulted in her cutting her thumb with a knife. Plaintiff

---

[1] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* 34 (4th ed. 2000). A GAF score between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

reported being depressed and under a lot of stress. Plaintiff's past medical history was noted to include diagnoses of schizophrenia and bipolar disorder. It was noted that plaintiff did not drink alcohol, however, had a long-standing habit of abusing prescription drugs by taking six or seven Xanax daily, which she bought off the street. Plaintiff reported that she began using Xanax about eighteen months earlier after she stopped using Ecstasy, which she had used for about four years. Plaintiff was voluntarily admitted to the Adult Psychiatric Unit at St. Bernard's and was placed on suicide precaution. (Tr. 257-61.)

Upon admission to the Psychiatry Unit, plaintiff reported that she was a pariah and that no one in her family wanted to talk to her. Plaintiff reported that her five children had been taken from her and that she currently lived with her grandparents. Plaintiff admitted to having smoked marijuana. Mental status examination showed plaintiff to have a depressed mood and affect. Plaintiff's speech was clear and concise, and she had average intellectual functioning. Dr. Herbert H. Price noted plaintiff's thought processes to be goal directed, and her thought content was centered on getting better. Plaintiff's judgment and insight were fair, and her memory was intact. During her admission, plaintiff had some panic attacks associated with intrusive memories. She participated in individual, group, and activities therapy, she was also given Celexa, Seroquel, and Tramadol. By January 7, she was denying any suicidal ideation. Plaintiff was discharged that

same date. Plaintiff's discharge diagnoses were major depression, recurrent; and borderline personality disorder. Upon admission, plaintiff was assigned a GAF score of 27. Upon discharge, her score was 67.[2] (Tr. 257-61.)

Plaintiff visited Ms. Young at MSHS on April 7, 2008, and reported that she was currently running out of her prescribed medications. Plaintiff reported that she became suicidal in January after taking twenty Xanax and drinking alcohol over a period of three days. Plaintiff reported a history of suicidal ideation and gestures. Plaintiff reported that she currently had poor energy and was irritable and impulsive when not taking medication. Plaintiff reported that medication made her a different person in that she no longer fights and she looks at things differently. Plaintiff reported having not used marijuana, alcohol, or Xanax for two months. Mental status examination showed plaintiff to have marginal grooming and hygiene, but otherwise was normal in all respects. Ms. Young diagnosed plaintiff with major depressive disorder, recurrent, moderate; and polysubstance abuse, early full remission. Bipolar disorder was to be ruled out. A GAF score of 57 was assigned. Plaintiff agreed to short term individual therapy after which she would

---

[2] A GAF score between 21 and 30 indicates behavior that is considerably influenced by delusions or hallucinations; a serious impairment in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation); or an inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends). A GAF score between 61 and 70 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

be scheduled for medication evaluation. (Tr. 314.)

On April 23, 2008, plaintiff visited Ms. Young at MSHS and underwent a diagnostic assessment. Plaintiff reported that she had not had any medication since April 5 and that she had been more depressed since running out of medication. Plaintiff also reported having sleep problems and poor energy. Ms. Young noted that plaintiff had a pending charge in relation to assaulting her neighbor and breaking out her car windows. Plaintiff's history of being sexually abused as a child by a family member was noted. Mental status examination showed plaintiff to have an unkempt appearance and constricted affect, but otherwise was normal. Plaintiff was diagnosed with major depressive disorder, recurrent, moderate; polysubstance dependence, early full remission; and borderline personality disorder. A GAF score of 52 was assigned. Ms. Young determined that further psychiatric evaluation was needed. (Tr. 315-21.) A one-year treatment plan was established, with such treatment to include medication management and monitoring as well as individual therapy. (Tr. 331-36.)

On May 21, 2008, plaintiff underwent a psychiatric evaluation at MSHS and reported that she "need[ed her] medicines back." Dr. Ali Hashmi noted that plaintiff had been treated off and on in the clinic, but never with any regularity. Plaintiff's January 2008 admission to St. Bernard's was noted, and plaintiff reported that she had overdosed on about twenty Xanax with alcohol. Plaintiff

reported having not used alcohol, marijuana, or Xanax off the street since her St. Bernard's admission. Plaintiff also reported having a long history of mood instability due to being sexually abused as a child. Plaintiff reported the medication received at St. Bernard's to be significantly beneficial for her anxiety symptoms, mood swings, and irritability but that it made her somewhat sleepy during the day. Plaintiff reported that she ran out of medication about one month prior and that her depression had worsened. Plaintiff reported that she lost her last job, because she was off of her medication and could not get along with her coworkers. Mental status examination showed plaintiff to be alert, oriented, tearful, and somewhat unkempt. Plaintiff's speech was normal and goal directed. Dr. Hashmi noted plaintiff's affect to be full and appropriate and her mood euthymic. Plaintiff's thought process was logical and coherent. Plaintiff denied any suicidal or homicidal ideation. Dr. Hashmi noted plaintiff's insight to be good and her judgment fair. Dr. Hashmi diagnosed plaintiff with bipolar disorder and chronic polysubstance abuse, in early remission. Post-traumatic stress disorder was to be ruled out. Plaintiff was prescribed Celexa and Seroquel and was instructed to participate in individual psychotherapy and to return in one month to check medication. Plaintiff was assigned a GAF score of 52. (Tr. 339-40.)

Plaintiff returned to Dr. Hashmi on June 19, 2008, and reported not doing well. Plaintiff complained of constantly being depressed and angry, and that she

experienced mood irritability and angry outbursts with her boyfriend and family members.  Dr. Hashmi noted plaintiff to have remained sober from her drugs of abuse.  Mental status examination showed plaintiff not to be tearful or overtly depressed.  Plaintiff had a broad affect and a cheerful mood.  Plaintiff was instructed to discontinue Celexa and to continue with Seroquel.  Lithium was prescribed.  Plaintiff was instructed to continue with psychotherapy and to return in one month.  She was assigned a GAF score of 53.  (Tr. 341.)

In a Discharge Summary dated December 15, 2008, Ms. Young from MSHS noted that plaintiff did not return for treatment and thus that it was determined that plaintiff terminated the service.  (Tr. 311-12.)

On March 31, 2009, plaintiff underwent a court-ordered alcohol and drug abuse evaluation at MSHS for the Division of Children and Family Services (DCFS).  Plaintiff reported to Del Thomas, Psy.D., that she tested positive for marijuana use in February 2009, but has not tested positive since.  Plaintiff reported that she first smoked marijuana in January 2009 and only smoked it once a week in circumstances such as when she went to a club.  Plaintiff reported never using marijuana on a daily basis.  Dr. Thomas noted previous medical records to show plaintiff's use of marijuana in December 2005 and April 2007, and that plaintiff reported in April 2007 that she abused Xanax and used Ecstasy.  Plaintiff acknowledged during the present evaluation that she bought Xanax off the street

for about three months prior to January 2008, but had not "popped a pill" since that time. Dr. Thomas determined that plaintiff was downplaying and misrepresenting the extent and frequency of her past substance abuse. Mental status examination was normal in all respects. Plaintiff was alert, fully oriented, pleasant, and cooperative. She was in no acute emotional distress, and she denied any suicidal ideations. It was noted that plaintiff had not taken any medication in the past month, because she no longer had Medicaid assistance. Dr. Thomas diagnosed plaintiff with cannabis abuse, history of abusing Xanax and Ecstasy, and personality disorder. A GAF score of 55 was assigned. Dr. Thomas recommended that plaintiff participate in a three-month program of outpatient substance abuse treatment with weekly counseling sessions. (Tr. 322-23.)

On May 12, 2009, plaintiff underwent a diagnostic assessment at MSHS upon referral by DCFS for substance abuse treatment. She was in custody on an outstanding warrant and was escorted to MSHS by the county police department. Plaintiff reported that she did better while on medication, but did not continue with medication management as a result of losing her Medicaid coverage. Counselor Kimberly Warren noted that plaintiff had been off of her medication for two months. Plaintiff reported ongoing anger and depressed mood. As to her history of substance abuse, plaintiff reported that she did not begin smoking marijuana until 2009 and that she had been smoking marijuana three times a day since being

off of her medication. Ms. Warren noted that this report differed from the report to Dr. Thomas. Plaintiff reported that she stopped abusing Xanax about eight or nine months prior and that she stopped using Ecstasy in 2007. Ms. Warren informed plaintiff that she would have to show continual proof through drug screening that she remained clean from drugs before being prescribed medication. Plaintiff requested that she be permitted to participate in individual counseling. Mental status examination was essentially normal. Plaintiff's appearance was noted to be unkempt, but she had a euthymic mood and full affect. She was cooperative and had a normal demeanor. It was noted that plaintiff did not demonstrate a risk of harm to herself or others. Plaintiff was diagnosed with bipolar disorder by history; cannabis abuse; polysubstance dependence, early partial remission; and personality disorder. Plaintiff was assigned a GAF score of 50.[3] Ms. Warren recommended that plaintiff participate in group therapy, individual therapy, and medication evaluation. (Tr. 324-30.)

After May 12, 2009, there are no additional medical records until October 2010 at which time another one-year treatment plan was established at MSHS in response to plaintiff's request for medication to help her control her anger and "be a normal person." Dr. Arif Mirza noted plaintiff's diagnoses of major depressive

_____

[3] A GAF score between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

disorder and anxiety state and determined plaintiff to meet the criteria for "seriously mentally ill." A plan for individual therapy, medication management, and therapeutic interventions was established. (Tr. 308-09.)

Plaintiff visited Dr. Mirza on January 4, 2011, for psychiatric evaluation. Dr. Mirza noted plaintiff to be very dramatic and emotional and to tell conflicting stories about her past medication use. Plaintiff also reported a history of suicide attempts and violence. Plaintiff reported her condition to have deteriorated since her medications changed and MSHS stopped her Xanax two years prior. Plaintiff was not currently taking any medication. Dr. Mirza noted plaintiff's reported symptoms to be poor impulse control and mood symptoms with agitation and avoidance. No clear depressive symptoms were observed, although plaintiff cried intermittently throughout the evaluation. Plaintiff continually interrupted the evaluation in order to return telephone calls and respond to text messages. Plaintiff reported occasional use of alcohol and active use of marijuana, but then stated that she last used marijuana two months prior. Plaintiff reported that she had never been addicted to Xanax, but admitted to borrowing Xanax from a family member the previous day as she was dealing with a death in the family. Dr. Mirza opined that plaintiff was not fully forthcoming or reliable regarding her legal and psychiatric issues and drug-seeking behavior. Dr. Mirza determined plaintiff's insight to be poor and her judgment limited. Dr. Mirza diagnosed plaintiff with

mood disorder, chronic insomnia, Xanax abuse, intermittent explosive disorder, and personality disorder with antisocial and borderline personality traits. Bipolar disorder was to be ruled out. Plaintiff was prescribed Seroquel for insomnia and to lessen the intensity of her mood swings, and Vistaril to take as needed for anxiety. Plaintiff was instructed to continue with individual psychotherapy and other services. Laboratory testing was ordered, and plaintiff was instructed to return in one month. (Tr. 305-07.)

Plaintiff's treatment plan was reviewed on March 11, 2011. It was noted that plaintiff had kept her psychological evaluation appointment, but did not keep her appointments for medication management. Plaintiff reported that she had abstained from mood altering substances. (Tr. 300-01.)

On April 5, 2011, Dan Donahue, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's affective disorder, personality disorder, and substance addiction disorder did not constitute severe mental impairments. Dr. Donahue opined that plaintiff's mental disorders caused only mild restriction in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. 343-56.)

Plaintiff's treatment plan with MSHS underwent review on June 13, 2011.

It was noted that very few appointments for treatment were made, but plaintiff attributed this to lack of transportation. It was recommended that plaintiff continue with treatment to prevent decompensation. It was noted that plaintiff had made minimal progress. Plaintiff reported doing really well when she takes medication. It was determined that plaintiff continued to need individual therapy, medication management, and interventions. (Tr. 403-05.)

Plaintiff appeared for therapy at MSHS on July 6, 2011, and was noted to be euthymic and to have a full range of affect. She was logical and goal oriented and did not appear distressed throughout the session. Plaintiff reported that she was unable to be around people and unable to work. It was noted that plaintiff was seeking disability. Plaintiff was noted to be vague in reporting specific symptoms other than her general inability to get along with people. Counselor Kimberly Abanathy determined that plaintiff had made no progress. Plaintiff was instructed to return in two weeks to work on strategies for interacting and socializing with others. (Tr. 402.)

Plaintiff visited Dr. Erby at MSHS on July 11, 2011, who indicated a belief that plaintiff returned to the clinic after an extended absence. This would be true for the gap in time from October 2010 when a one-year treatment plan was developed. Plaintiff reported that she had been unable to keep her follow up appointments, because her Medicaid stopped. Plaintiff complained of having panic

attacks and requested that medication be prescribed. Dr. Erby advised plaintiff that he would not prescribe Xanax. Plaintiff also reported having depressive symptoms. Plaintiff reported that she diverted Xanax from her mother in the past, bought hydrocodone off the street, and smoked marijuana. She reported last smoking marijuana two months prior and last using hydrocodone in August 2010. Plaintiff reported drinking a fifth of wine at one sitting about twice a month. Dr. Erby noted plaintiff not to exhibit any overt signs of anxiety, panic attacks, depression, tears, or mania. Dr. Erby diagnosed plaintiff with unspecified episodic mood disorder; insomnia; sedative, hypnotic, or anxiolytic abuse; and personality disorder. A GAF score of 52 was assigned. Dr. Erby prescribed Seroquel and Sertraline and instructed plaintiff to return in one month for follow up. (Tr. 400-401.)

Plaintiff visited MSHS for therapy on August 9, 2011, and demonstrated a euthymic mood and full range affect. Ms. Abanathy noted plaintiff to be logical and goal oriented. It was noted, however, that plaintiff appeared to have no insight into the problems of her behavior inasmuch as she was acting in a jovial manner while reporting that she recently punched a girl and threw her to the ground while the other girl did not fight back. Plaintiff reported to Ms. Abanathy that the other girl "deserved it." Ms. Abanathy determined that plaintiff had made slight progress, and she instructed plaintiff to return in two weeks. (Tr. 398.)

Plaintiff visited Dr. Erby that same date, August 9, and reported feeling significantly better with medication. Plaintiff reported that she was sleeping well and was not depressed. Dr. Erby observed plaintiff to be relaxed and friendly and not to display any evidence suggesting depression. Plaintiff's medication was refilled and she was instructed to return in three months. (Tr. 396-97.)

Plaintiff's treatment plan with MSHS underwent review on October 12, 2011. It was noted that plaintiff missed some appointments during the previous ninety days, but plaintiff reported that she could not keep her appointments as she was doing community service. It was determined that plaintiff continued to need individual therapy, medication management, and interventions. (Tr. 407-09.)

On November 10, 2011, plaintiff failed to appear for a scheduled therapy session at MSHS. (Tr. 418.)

Plaintiff's treatment plan with MSHS underwent review on January 18, 2012. It was noted that plaintiff did not keep any appointments during the previous ninety days. It was noted that plaintiff's case would be closed if she failed to appear for her next appointment on January 31. It was determined that plaintiff needed the services for full remission of her symptoms. (Tr. 415-17.)

Plaintiff returned to Dr. Erby on January 31 and reported that she had racing thoughts at night and could not sleep. Dr. Erby noted plaintiff not to exhibit irritability or symptoms of depression. Plaintiff's grooming and hygiene were

noted to be adequate. Plaintiff was continued in her GAF score of 52 and diagnoses of unspecified episodic mood disorder; insomnia; sedative, hypnotic, or anxiolytic abuse; and personality disorder. Plaintiff's prescriptions for Sertraline and Seroquel were refilled, and plaintiff was instructed to return for follow up in four months. (Tr. 414.)

In a note dated March 19, 2012, it was reported that plaintiff did not appear for a scheduled psychiatric evaluation at MSHS and that her case may be closed if she failed to appear at the rescheduled evaluation in May. (Tr. 412.)

A nursing note dated April 18, 2012, reported that plaintiff had no side effects or adverse reactions with her medications and had demonstrated slight progress. Plaintiff reported that she was doing well in that she was able to afford her medications and was looking forward to being able to pay for her Seroquel. Plaintiff was given samples of Seroquel. (Tr. 423, 424.)

On May 10, 2012, plaintiff underwent a diagnostic assessment at MSHS to determine whether she would be a candidate for Mental Health Court. It was noted that plaintiff had a lengthy legal history and currently was on probation for fraudulent use of a credit card and was currently charged with nonpayment of fines, failure to complete "hot check class," and failure to complete community service. Plaintiff reported that her life was chronically unstable. She reported her thirteen-year-old child to be in the custody of the Division of Youth Services due

to behavioral problems, and that her other children lived with either their father or godmother.  Plaintiff reported being unable to maintain employment, because of her anger and inability to get along with others.  Plaintiff reported chronic feelings of loneliness and anger on account of her difficulty in developing and maintaining any stable relationships.  Plaintiff reported that she regularly abuses Xanax by buying it from friends on the street.  It was noted that plaintiff was not manic nor described a depressed state.  She was not suicidal or homicidal.  Some traits associated with a personality disorder were observed, with admitted manipulation, unlawful behavior, and antisocial behaviors.  Plaintiff's current GAF score was determined to be 50.  (Tr. 421-22.)

## IV.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through June 30, 2012.  The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability.  The ALJ found plaintiff's depression, anxiety, and drug abuse to be severe impairments, but that they did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings).  (Tr. 15-16.)  Considering all of plaintiff's impairments, the ALJ determined plaintiff to have the residual functional capacity (RFC) to

> perform work at all exertional levels but with the following
> nonexertional limitations:  the claimant could only perform unskilled,

standardized work involving few, if any, changes. The work could only be simple, routine and repetitive in nature with one or two-step instructions. The work would be done alone and not in collaboration with others or in a team. Supervision would need to be simple, direct and concrete. Further, there could be no contact with the general public but the individual could maintain occasional contact with co-workers and supervisors. Finally, the individual would be restricted from work involving production quotas such as assembly line or piecework. Additionally, the claimant could be expected to have up to three unscheduled absences per month due to psychologically based symptoms.

(Tr. 16.) The ALJ determined plaintiff unable to perform her past relevant work, nor any other work as it exists in significant numbers in the national economy. (Tr. 20-21.)

The ALJ then determined that, if plaintiff stopped her substance abuse, her impairments would continue to be severe and would continue not to meet the Listings. (Tr. 21-22.) The ALJ determined that, in the absence of substance abuse, plaintiff would have the RFC to

perform work at all exertional levels but with the following nonexertional limitations: the claimant could only perform unskilled, standardized work involving few, if any, changes. The work would be simple, routine and repetitive in nature with one or two-step instructions. The work would be done alone and not in collaboration with others or in a team. Supervision would need to be simple, direct and concrete. There could be no contact with the general public but the individual could maintain occasional contact with co-workers and supervisors.

(Tr. 22-23.) The ALJ found this RFC to preclude plaintiff from performing her past relevant work. However, upon consideration of this RFC coupled with

plaintiff's age, education, and work experience, the ALJ found that vocational expert testimony supported a finding that, in the absence of substance abuse, plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, as a cleaner in a hospital, nursing home, or similar facility; and cleaner/housekeeper.  The ALJ thus found that plaintiff would not be disabled if she stopped her substance abuse.  The ALJ therefore found that plaintiff's substance abuse was a contributing factor material to a finding of disability and that plaintiff was not disabled as defined under the Social Security Act at any time from the alleged onset date of disability through the date of the decision.  (Tr. 25-26.)

## V.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity

that [she] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, a finding of "disabled" is appropriate.

In cases involving evidence of substance abuse, this initial disability determination must be based on substantial evidence of a claimant's limitations "without deductions for the assumed effects of substance abuse disorders." *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2011). If, upon consideration of all such limitations, the ALJ finds the claimant to be disabled, the ALJ must then consider which limitations would remain when the effects of substance abuse are absent. *Id.* at 694-95; 20 C.F.R. §§ 404.1535(a), 416.935(a). "An individual is not considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The "key factor" is whether the claimant would continue to be found disabled if she stopping using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). The claimant bears the burden of proving that her substance abuse is not a contributing factor material to the claimed disability. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002).

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes,* 275 F.3d at 724. Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a

- 25 -

mere search of the record for evidence supporting the Commissioner's findings."

*Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks

and citation omitted). "Substantial evidence on the record as a whole . . . requires

a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by

substantial evidence on the record as a whole, the Court must review the entire

administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted). The Court must also consider any evidence

which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at

770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even

though two inconsistent conclusions may be drawn from the evidence, the

Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

The ALJ here found plaintiff's substance abuse to be a contributing factor material to a finding of disability. For the following reasons, the ALJ did not err in this determination.

As set out above, the first RFC assessment in the ALJ's written decision was made upon consideration of all of plaintiff's limitations – including those caused by plaintiff's substance abuse – and resulted in numerous significant work-related restrictions, including that plaintiff would have three unscheduled absences from work each month. When posed with a hypothetical that included all of these restrictions, the vocational expert testified that such a person would be precluded from all employment. In response to another hypothetical, however, where the restriction to having unscheduled absences up to three times a month was eliminated (but all other restrictions remained), the expert testified that such a person could perform other work in the national economy and gave details

regarding the nature of such work and the number of jobs available.

In his written decision, the ALJ set out a second RFC that included only those limitations that plaintiff would have if she stopped her substance abuse. In this second RFC, the ALJ determined that, if plaintiff stopped such abuse, the disabling limitation of having up to three unscheduled absences from work each month would not remain. In view of the vocational expert's testimony that a person with this circumstance could perform certain other work in the national economy, the ALJ concluded that plaintiff – with this RFC – could perform this other work if she abstained from such abuse.[4] This finding is supported by substantial evidence on the record a whole.

In his written decision, the ALJ thoroughly summarized the evidence of record detailing the sporadic and intermittent treatment received by plaintiff for her mental impairment. A review of the record *in toto* shows that during limited periods of abstinence from substance abuse, and particularly from January to June 2008 and during the summer of 2011, plaintiff regularly followed up with counselors and psychiatrists during scheduled appointments and demonstrated improvement in her symptoms with prescribed medication. Indeed, plaintiff reported that the medication made her a "different person," in that she no longer

_____

[4] The second RFC in the written decision also eliminated the restriction that plaintiff could not perform work involving production quotas. The vocational expert testified, however, that a person *with* this restriction could perform other work. It cannot be said, therefore, that the ALJ erred by concluding that a person *not* so restricted could perform this same work.

fought, was not as irritable, and experienced lessened anxiety. Although isolated exacerbations of symptoms occurred during these periods, the record shows them to be caused primarily by plaintiff's failure to take her prescribed medication. In addition, while plaintiff's physician(s) adjusted her medication according to her symptoms, the effectiveness of such adjustments were unknown given plaintiff's eventual failure to return for follow up. With respect to the multiple instances when plaintiff failed to keep follow up or other scheduled appointments, the record shows these episodes to coincide with plaintiff's resumption of and/or continued substance abuse. This circumstance is demonstrated in notes from plaintiff's May 2009 assessment at MSHS that show plaintiff's resumption of Xanax abuse to have occurred at approximately the same time she failed to appear for follow up appointments at MSHS in 2008. Furthermore, the record shows that she continued to engage in substance abuse thereafter – whether it be smoking marijuana, using hydrocodone bought from the street, excessive use of alcohol, or resuming Xanax abuse. Likewise, the record shows that plaintiff's failure to keep scheduled appointments and assessments after her period of abstinence in 2011 coincided with her abuse of Xanax that she bought from friends on the street. Plaintiff testified at the June 2012 hearing that she stopped using Xanax only about fifty days prior when she went to jail for failure to pay fines.

As demonstrated above, a review of the evidence in its entirety shows that

plaintiff appeared for scheduled appointments during periods when she abstained from substance abuse. Such evidence supports the ALJ's determination that plaintiff's limitation of having up to three unscheduled absences from work each month would not remain if she stopped the substance abuse. *E.g.*, *Vester v. Barnhart*, 416 F.3d 886, 890 (8th Cir. 2005) (a claimant's improved condition during periods of sobriety may be evidence supporting an ALJ's finding that the claimant's substance abuse is material to her disability). This finding is further supported by evidence demonstrating that plaintiff's failure to appear for scheduled appointments coincided with her active substance abuse. Because a reasonable person considering the record as a whole could reach the same conclusion as the ALJ, the decision of the ALJ must be affirmed. *Id.* at 891-92.

Plaintiff argues, however, that the ALJ failed to detail his reasons and explain why her RFC would be different in the absence of substance abuse. Plaintiff cites *Brueggemann v. Barnhart*, 348 F.3d 689 (8th Cir. 2011) and *Pettit v. Apfel*, 218 F.3d 901 (8th Cir. 2000), to support her argument that the ALJ's failure to make such specific findings warrants remand. Plaintiff's argument is misplaced. In *Brueggemann*, the ALJ wholly failed to follow the procedures prescribed in the Regulations for determining disability when evidence of substance abuse is present in the record. Further, as noted by the Eighth Circuit, the record showed that the claimant continued to exhibit symptoms of depression during periods of sobriety

that were severe enough to merit hospitalization. *Brueggemann*, 348 F.3d at 693-94.  In *Pettit*, without detailed explanation, the ALJ determined that claimant's depression was of listing level severity, but that his alcohol abuse was a contributing factor material to this finding of disability.  The Eighth Circuit reversed, finding the record to demonstrate that the claimant had stopped drinking prior to the time he applied for benefits and continued to suffer from depression long after, despite treatment with medication and therapy.  With this evidence of claimant's continued depression after a long period of maintaining sobriety, the Eighth Circuit was unable to determine from the record why the ALJ found alcohol abuse to be material to the finding of disability.  *See Pettit*, 218 F.3d at 903-04.

Unlike the circumstances in *Brueggemann* and *Pettit*, there is substantial evidence on the record in this case from which to determine that plaintiff's continued substance abuse was material to the ALJ's initial finding of disability. As detailed above, a review of the record shows that during her limited periods of abstinence, plaintiff demonstrated few, if any, symptoms of a mental impairment. She kept her appointments and participated in medication management and therapy that significantly improved her symptoms.  Plaintiff's failure to appear for other appointments regularly coincided with her resumption of and/or continued drug and excessive alcohol use.  The ALJ here followed the prescribed analytical framework as set out in the Regulations, thoroughly set out the factual evidence

detailing plaintiff's mental impairments and her substance abuse, and reached a conclusion supported by substantial evidence on the record as a whole. Because a review of the record shows there to be substantial evidence to support the ALJ's decision, it must be affirmed. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (ALJ's denial of benefits will not be reversed as long as decision falls within "available zone of choice").

To the extent plaintiff claims that the ALJ "wrongly rejected" her GAF scores that showed serious limitations in her functional abilities, a review of the ALJ's decision shows him not to have rejected the scores, as claimed by plaintiff, but to have placed the scores in context with other evidence of record in a manner consistent with the policy statements of the Social Security Administration. The ALJ specifically considered plaintiff's assigned GAF scores that demonstrated her to exhibit moderate to serious symptoms, but properly noted that GAF scores in themselves do not necessarily correlate with a finding of disability. (*See* Tr. 19.) As determined by the Social Security Administration, the GAF scale has not been endorsed for "use in the Social Security and SSI disability programs" and "does not have a direct correlation to the severity requirements in [the] mental disorders listings." 65 FR 50746-01, 50764, 2000 WL 1173632 (Soc. Sec. Admin. Aug. 21, 2000); *see also Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010). As

such, an ALJ is not bound by GAF scores assigned by a claimant's provider in determining the effects of the claimant's mental impairment; instead, the ALJ must review the record as a whole. *Halverson*, 600 F.3d at 931. This is what the ALJ did here.

## VI. Conclusion

When reviewing an adverse decision by the Commissioner, the reviewing Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Id.* Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome, or because another court could have decided the case differently. *Id.*; *see also Buckner,* 646 F.3d at 556; *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

For the reasons set out above on the claims raised by plaintiff on this appeal, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that, in the absence of substance abuse, plaintiff would be able to perform work that exists in significant numbers in the national economy, and thus not to be disabled as defined by the Social Security Act. Because substantial

evidence on the record as a whole supports the ALJ's decision, it must be affirmed. *Davis*, 239 F.3d at 966.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

**/s/** Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of March, 2015.